## Wallace v. Watson.

### Opinion delivered November 10, 1919.

1. HUSBAND AND WIFE—JOINT DEPOSIT—TITLE—ORIGIN OF FUND.— At the time of the death of one A. two time deposits stood in her name in two banks. The funds represented by the one were derived from the sale of a piece of property belonging to her, and deposited in her name by J., her husband. The other was from dividends collected by J. in a policy of insurance on his life, payable to his wife, and deposited by him in her name. *Held*, these time deposits were the property of A. and not of her husband, J.

2. SAME—SAME—CHECKING ACCOUNT—GIFT INTER VIVOS.—Where a husband changed his checking account to his wife's name, giving her possession of the bank book, this constitutes a gift *inter vives* between the husband and wife, although the husband continues to draw on the account signing his wife's name "by" his own. But the account will be held still to be the property of the husband, where the evidence clearly shows an intention on the part of both parties that that be so.

Appeal from Saline Chancery Court; *J. P. Henderson,* Chancellor; reversed in part.

*Mehaffy, Reid, Donham & Mehaffy,* for appellants.

1. The money on deposit is shown by the evidence to belong to Mrs. A. B. Watson. The earnings of a married woman arising from her services done and performed on her account become her separate property. 47 Ark. 485.

The wife did not permit her husband to have the control or management of the time deposits and she never parted with her title, for the presumption is that the husband was acting as trustee or agent of the wife. Kirby's Digest, § 5227; 84 Ark. 355. Her right to same is not prejudiced by her failure to schedule. Kirby's Digest, § 5226; 42 Ark. 69. The money was absolutely the wife's. 79 Ark. 69. The husband never drew any checks in his own name but always drew in the name of his wife by J. B. Watson. The time deposits and the checking account belonged to the wife and she at no time parted with the title to the same. The $500 in the First National Bank was the wife's, because it was derived from the sale of her property and immediately deposited in her name, and so remained at her death. The $500 in the Bank of Benton was also hers because deposited in her name two or three years before her death and remained unmolested and unused by appellee or anyone else until after her death. The checking account was hers also, because it was made up of funds belonging to her and deposited in her name and derived from her business and rentals from her real estate. The husband recognized her title at all times and all checks were drawn in her name and in the conduct of her business. Appellant, Maude Wallace, is her sole heir, and all these deposits belong to her. If they belonged to the husband, he parted with his title when he deposited them in her name. The deposits became a gift to the wife. 79 N. Y. S. 592; 21 N. E. 692; 27 S. E. 32; 67 Pac. 331. It was a gift *inter vivos.* 67 N. E. 232; 51 S. W. 169; 51 Atl. 249; 55 Atl. 684. Delivery of the deposit book to the wife vested the title in her. 39 Atl. 201; 24 Pick. 241; 129 Mass. 425; 36

Conn. 88; 63 Me. 364; 26 N. E. 627; 25 Atl. 598; 2 N. Y. Supp. 425; 40 Vt. 597. In the first instance the deposit in the wife's name constitutes a completed gift to the wife. Cases *supra.*

2. There is another reason why appellee can not assert title to these bank deposits. He began taking title to real estate in his wife's name because his business was burned at Bauxite and he desired to place it beyond his creditors, as he was in debt. He is estopped to claim the funds. 7 Ark. 516; 33 *Id.* 294; 53 *Id.* 150; 47 *Id.* 311; 16 Cyc. 145; 26 N. W. 498; 62 *Id.* 990; 66 S. W. 160; 62 Am. Dec. 359; 38 S. E. 181; 23 S. E. 571; 16 *Id.* 371; 46 *Id.* 732; 6 *Id.* 142; 10 R. C. L. 389.

3. Fraudulent transfer of property is valid as between the parties. 20 Cyc. 610; 98 N. W. 604; 40 N. E. 223. Voluntary conveyances if executed in fraud of creditors are valid between the parties. 19 Ark. 650; 77 *Id.* 60; 52 *Id.* 171; *Ib.* 389; 59 *Id.* 521; 188 S. W. 552; 47 *Id.* 301; 106 *Id.* 9. It can only be avoided by creditors. 11 Ark. 411; 67 *Id.* 325. The decree should be reversed and the deposits given to Maude Wallace, appellant.

The appellee, *pro se.*

The evidence shows that Mrs. Watson did not let her husband use the money on deposit as his own, but as hers. She had nothing to do with the time deposits nor certificates issued; he handled the money deposited as he did the checking account, and she did not allow him to use it as his own but as her's. By the deposits the money became her own and the decree below is right. There is no estoppel and the moneys belonged to appellee, and the decree is right. See authorities cited by chancellor, and also 30 Ark. 79; 73 *Id.* 338; 74 *Id.* 161; 81 *Id.* 328; 84 *Id.* 328; 93 *Id.* 93; 92 *Id.* 625; 115 *Id.* 416; 101 *Id.* 451; 121 *Id.* 550; 21 Cyc., par. 111, p. 1498; 21 Cyc. 1409, par. B, and *Ib.* 1412, par. C. The decree should be affirmed.

STATEMENT OF FACTS.

Mrs. A. B. Watson died intestate December 27, 1916, at Benton, Arkansas. She left surviving, her husband.

J. B. Watson and by him one child, Mrs. Maud Wallace. At the time of her death there was a time deposit in the "First National Bank" of Benton, in the sum of $500 and in the "Bank of Benton" the sum of $500; there was also at that time a balance on a checking account in her name in the sum of $926.25.

This action was instituted by J. B. Watson against Maude Wallace and W. C. Wallace.

The complaint alleged in substance that, although the money in these banks was in the name of A. B. Watson at the time of her death, the money was deposited in his wife's name by J. B. Watson but with no intention to transfer title to the property to her and that the money was in fact his property; that his daughter, Mrs. Wallace, and her husband were claiming the same.

Maude Wallace and W. G. Wallace answered admitting the deposits and setting up in substance that the money on deposit was the property of A. B. Watson at the time of her death, and hence belonged to Maude Wallace as her daughter and only heir.

The testimony material to the issues is substantially as follows: M. F. Scott testified that he was assistant cashier of the First National Bank of Benton from November, 1909; that J. B. Watson had an active checking account in that bank up to June, 1911, when the account was garnished; that the next morning thereafter Watson came to make a deposit and was told about the garnishment and informed that if he kept on depositing in his own name that the deposits would go the same as the balance he had had to his credit, and he then opened up an account in his wife's name; that the account thus opened was handled just like the first account by J. B. Watson only the checks were signed A. B. Watson by J. B. Watson.

Witness became cashier of the Bank of Benton when it was organized in November, 1911; not long thereafter an account was opened with that bank by J. B. Watson in the name of A. B. Watson; at the time of the death of Mrs. A. B. Watson the checking account

amounted to $926.25 and the time deposit amounted to $500; after the death of Mrs. Watson, J. B. Watson wished to change the account to his name; Mrs. Wallace objected to the change claiming that the money belonged to her mother; the account up to the time of Mrs. Watson's death was subject to check by either of them; the writ of garnishment directed against the First National Bank to garnish the funds of J. B. Watson on deposit in that bank was served some time after Watson had gone out of the Benton Feed & Grocery Company; at no time after this garnishment did J. B. Watson have an account in the First National Bank in his own name; it was all in the name of his wife; the first deposit made in the Bank of Benton was November 18, 1911, and the last deposit was made December 22, 1916, with 56 intervening deposits, all made in the name of A. B. Watson; there was a time certificate deposit of $500 which was in her name at the time of her death.

The cashier and former bookkeeper of the First National Bank of Benton testified that J. B. Watson made all of the deposits after the garnishment proceedings in his wife's name and had the interest accumulations added to the account in her name; that at the death of Mrs. Watson, December 27, 1916, there was an outstanding certificate for $500 in her name. This certificate was dated October 8, 1915, and was numbered 511 and so remained in her name under the same certificate number until after her death; that April 17, 1917, the certificate of Mrs. A. B. Watson was turned in and a certificate for that sum was issued to J. B. Watson who also deposited an additional $500 and another certificate was issued for that sum in the name of Edward Watson; that these certificates were changed on April 17, 1918, to the names of J. B. Watson and Rose Watson; that the account with Mrs. A. B. Watson in the First National Bank was opened June 10, 1911, on which date the first deposit in her name was made and the last deposit was made on May 28, 1912; that there were several intervening deposits; that the account was closed and checked out August 9,

1913; that J. B. Watson opened his personal checking account January 3, 1910, and closed it June 24, 1911.

One witness testified that he rented the LaGrande Hotel building from Mrs. A. B. Watson in 1913; that he always made out a check to Mrs. A. B. Watson and usually handed it to J. B. Watson; that the lease contract was not signed by J. B. Watson and all the rental checks were made payable to Mrs. Watson, the one from whom witness understood he was renting it.

Another witness testified that he was engaged in a partnership business with J. B. Watson known as the Benton Feed & Grocery Company; that when they quit business they owed an implement company something like $1,000; that the partnership was sued for the balance of that sum and judgment was obtained against it.

Mrs. Wallace testified that she was married to W. C. Wallace August 24, 1912; that about the first of September thereafter she and her husband assumed control and management of the hotel; that the agreement was made with her father and mother; that her mother died December 27, 1916, and that the moneys that were in the two banks at the date of her mother's death belonged to her; that the funds were on deposit in her name; that the money was made by her, most of it; that she always kept boarders and ran a store while witness' father was running the gin; that she did as much as he did; that her mother was the proprietor of the hotel until the property was let to witness and her husband; that when her mother and father first went into the hotel business her mother rented it and afterwards bought it; that the hotel register and the hotel stationery shows that Mrs. A. B. Watson was the proprietor of the hotel from October 3, 1905, up to the time the same was rented to witness and her husband. Witness considered the bank deposits her mother's because her mother made the money by keeping the hotel and also by renting the houses that belonged to her; that the title to the rent houses and also the hotel was in her name.

J. B. Watson testified substantially as follows: That he married his first wife by whom he had one child, to-

wit, Mrs. Maude Wallace; that they lived in Alexander, Arkansas, about 23 years; they were in business there; that he moved to Bauxite, was in business there for three or four years until his business was burned out and he then moved to Benton about 1905; that he was the proprietor of the business at Alexander and Bauxite and also of the business at Benton called the Benton Feed & Grocery Company; that when he bought the hotel at Benton he had the same deeded to his wife.

He stated that he did not keep the hotel business separate; they ran the business as one. Witness says "what was mine was hers and what was hers was mine." He opened an account in the name of A. B. Watson, his wife, in the First National Bank; that he did this under the advice of the cashier who told him that his individual account had been garnished, and if he didn't want the balance of his money tied up to put it in his wife's name; that it was witness' money with which he opened this account in his wife's name; that he drew checks upon it by signing the name A. B. Watson by J. B. Watson, and that continued until after her death; that there were no funds of A. B. Watson deposited in the account; that after his wife's death he did not want to continue writing her name and he checked it out and put it in his name; that he did this by writing A. B. Watson by J. B. Watson; that his wife, A. B. Watson, never wrote a check in her life unless witness asked her to; when she wrote one she signed A. B. Watson; that he and his wife earned the money jointly that went into the account by running the hotel, feed business and other business that he had and collecting the rents from the buildings; that it all went in together and witness exercised complete control over it.

In regard to the $500 time deposit he testified: "The $500 on time deposit in the First National Bank I got from Mr. Glynn. I sold Mr. Glynn a piece of property and got $500. The property was in my wife's name and with the $500 I took out the time deposit in the First National Bank in the name of my wife, A. B. Watson; it was not changed to my name until May after her death."

Further along in his testimony with reference to this particular deposit he states that the $500 was deposited in the First National Bank of Benton and was derived from property that was in his wife's name. It was deposited in the bank just as quick as he sold the property, about two years before the death of his wife, and since her death he had changed the account and put the same in his own name and in the name of his present wife. He also testified that he had not had a bank account in his own name in the First National Bank from the time the garnishment was served until after the death of his wife. His wife had an account in her name but the funds were his. He stated, however, that the funds were derived from the rental of houses, the title to which stood in her name, and from the hotel business, which was in her name, and from other moneys as they would come in; that soon after the Bank of Benton was opened up witness discontinued the bank account in his wife's name in the First National Bank and transferred it to the Bank of Benton. At the time of his wife's death there was a time deposit of $500 in the Bank of Benton in his wife's name derived from the dividend on a policy which he had in the New York Mutual, and in addition to this there was a checking account in the bank in her name of $713, which he drew. After her death he collected $500 on a life insurance policy and put the same in the Bank of Benton and had a certificate of $500 issued to himself and one in the name of Edward Watson. His testimony tends to show that for some two years after the death of his first wife his daughter did not make any claim to the moneys on deposit in the banks in the name of A. B. Watson, and that the controversy concerning this arose between them because of objections made by her and her husband to his second marriage.

There was much more testimony in the record, but the above is all that is material to the issue presented by this appeal.

The chancellor entered a decree awarding to the appellee "the moneys in the banks at the time of the death

of Mrs. A. B. Watson which were deposited in her name."
This appeal has been duly prosecuted.

WOOD, J., (after stating the facts). The only issue
on this appeal is whether or not the money on deposit in
the banks in the name of A. B. Watson at the time of her
death was her property or the property of J. B. Watson,
her husband. The learned chancellor rendered an elab-
orate opinion which shows that he has thoroughly con-
sidered every phase of the testimony presented by this
record. Concerning the title to the money on deposit in
the banks in the name of appellee's wife at the time of
her death he says: "By the conduct of the wife and the
plaintiff all the moneys deposited in the wife's name to
her death must be held as the husband's moneys, for she
permitted him to so deposit and use the same."

(1) As to the time deposits the trial court, as we
view it, by the above conclusion clearly misapprehended
the facts. The $500 time deposit in the First National
Bank which was made on October 8, 1915, and for which a
certificate was issued in the name of A. B. Watson (No.
511) was funds derived from the sale of real estate, the ti-
tle to which, the undisputed evidence shows, was in the
name of Anna B. Watson. The appellee, himself, testified
that this sum was the proceeds from the sale of a piece of
property which belonged to his wife and which he sold
to Mr. Glynn and the money was deposited in his wife's
name as quick as he sold the property which occurred
about two years before her death. This money which
was a time deposit and for which the certificate was is-
sued was never used or changed by the appellee from the
name of his wife to his own, nor was it changed in any
way, but remained as originally deposited under certifi-
cate number 511 until sometime after Mrs. A. B. Wat-
son's death.

True, the appellee also testified that the property
which he sold to Mr. Glynn was property which he had
purchased with his own funds and to which he had had
the title made in the name of his wife, A. B. Watson.

When asked why he had done this, he stated that he commenced that way when he came to Benton; he wanted his wife to have title to the real estate.

Section 5225 of Kirby's Digest provides, in substance, that any person who shall give any property to a married woman may schedule and record the same as the separate property of such married woman with the same and like effect as though such had been done by such married woman, and any conveyance shall have all the effect of a schedule filed by the married woman herself.

Section 5226 provides that the separate estate and property of a married woman shall not be forfeited nor shall her right and title thereto be prejudiced by a failure or neglect to file the schedule, but such failure in a suit relating to said property only has the effect of placing the burden upon the married woman to show that the same was her separate property.

As to the $500 time deposit in the Bank of Benton, this was derived from the dividends on an insurance policy which appellee carried on his own life in favor of his wife, Mrs. A. B. Watson, and which he had collected some two or three years prior to her death and immediately deposited in his wife's name in the Bank of Benton. The fund so deposited remained in her name under the same certificate number until after her death.

The testimony of the appellee himself shows that these time deposits were made by him for his wife and certificates taken in her name because he had several years before concluded to put the title to the property acquired by him in her name. Therefore, it appears from the undisputed evidence that these time deposits were really the funds of Mrs. A. B. Watson by gift from her husband before they were deposited by him in the banks and that when he so deposited them he was merely depositing her own funds.

While he testified that "what was his was hers and what was hers was his," yet his conduct with reference to these time deposits clearly shows that he did not withdraw them and place them on the general checking ac-

count, did not check against them but by allowing them to remain on deposit in the name of his wife he treated them as the separate property of his wife. The facts disclosed by the record do not warrant the conclusion that Mrs. Watson permitted her husband to have the absolute custody, control and management of these time certificates. The burden was upon the appellee to show by some affirmative act with reference to these funds that he did have custody, control and management thereof with the right to use the same as his own before it could be said that his wife had made a gift to him of the funds. Such being the case, if she had permitted him to have the custody, control and management thereof, this fact under the statute would not have been sufficient evidence that she had relinquished her title to the property, but in such case his custody, control, and management under the statute would only create a presumption that he was acting as her agent.

Under such a state of facts the burden would be upon Watson to overcome this presumption by showing that his wife had made a gift of the property to him. See section 5227, Kirby's Digest.

There is no evidence to warrant any such conclusion as to these time deposits, but the undisputed evidence, as we have already observed, is to the contrary.

(2) The checking account stands on a different footing from that of the time deposits. The testimony of Mrs. Wallace shows that her mother was in the possession of the bank deposit books after the transfer of the checking account to her name. This, coupled with the fact that such account was changed by J. B. Watson to the name of his wife, was sufficient to establish the completed gift *inter vivos* by J. B. Watson to A. B. Watson. *In re Holmes,* 79 N. Y. Supp. 592; *Goelz* v. *People's Savings Bank,* 67 N. E. 232; *Barker* v. *Harbeck,* 2 N. Y. Supp. 425; *Watson* v. *Watson,* 39 Atl. 201, and cases there cited; *Wickford* v. *Corey,* 55 Atl. 684; *Halowell Savings Inst.* v. *Titcomb,* 51 Atl. 249. See also *King, Admr.* v. *Allen,* 132 Ark. 54.

Nevertheless, we are convinced that the preponderance of the evidence also shows that Mrs. A. B. Watson after the transfer of the funds in the checking account in her name did not intend to hold or use the same as her sole and separate property. On the contrary the evidence is practically undisputed that she permitted her husband to have the custody, control, and management of the property precisely the same as he had done when the account was in his own name.

Before the garnishment proceedings were had the appellee had a general checking account in his own name in which he deposited the money of his own and also the moneys derived from sales and rentals of property which belonged to his wife and all the funds that represented their joint efforts. He drew on this account to pay for the general expenses of the family and had the custody, control and management of all their separate and joint funds just as if the same were all his own. After the garnishment proceedings the testimony of the appellee shows, and there is no evidence to the contrary, that he abandoned the account in his own name and opened the account in his wife's name without her knowledge and without consulting her. He continued thereafter to deposit moneys and to check on this account just as he had done before except that the checks were signed A. B. Watson by J. B. Watson.

Appellee testified that his wife never drew a check for any purpose unless he asked her to. His testimony shows that the transfer of the account from his name to that of his wife was at the suggestion of the cashier of the bank, and that it was understood between him and the bank that the account was to be handled the same as it had been before the transfer except that the checks were signed A. B. Watson by J. B. Watson. His testimony shows that his wife was cognizant of these facts. After the death of his wife, Watson continued to deposit his own money in her name for several months.

The above facts are sufficient to overcome the statutory presumption that he was acting as an agent or

trustee in dealing with the funds of his wife and warranted the inference that she had made a gift of these funds to her husband and that she intended for him to use the money as his own.

The case as to the funds in the checking account comes well within the doctrine of *Lishey* v. *Lishey*, 2 Tenn. Ch. 5, quoted by us in *Wyatt* v. *Scott*, 84 Ark. 355-8, as follows: "The weight of authority undoubtedly is that if the husband and wife living together have for a long time so dealt with the separate income of the wife as to show that they must have agreed that it should have come to the hands of the husband to be used by him (of course, for their joint purposes), that would amount to evidence of a direction on her part that the separate income which she otherwise would be entitled to should be received by him."

We also said in the above case, "But a gift may be and will be inferred when the proof shows that the money was received by the husband and used with the knowledge and consent of the wife in such manner as to preclude the idea or inference that she expected him to account for same to her as agent or trustee."

It follows that the decree of the chancellor awarding the amount of the funds in the checking account, to-wit, the sum of $926.25 to the appellee will be affirmed, but the decree, in so far as it awards the title to the amount of the funds of the time deposits, to-wit, the sum of $1,000, to the appellee, will be reversed and the cause remanded with directions to enter a decree in accordance with this opinion and for such other and further proceedings according to law as may be necessary to protect the respective rights of the parties.